**SO ORDERED.**

**SIGNED this 23rd day of November, 2026.**

Dale L. Somers
United States Bankruptcy Judge

---

*Designated for Online Publication Only*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **In re:** | |
| **Brody Holdings, LLC,** | **Case No. 26-40399**<br>**Chapter 11** |
| **Debtor.** | |

**Memorandum Opinion and Order Partially Granting Motion for Relief from Stay [Doc. 100]**

In April 2026, Simmons Bank sued Brody Holdings in Kansas District Court for failure to pay two commercial real estate loans and to foreclose on its shopping center collateral. After the Kansas court appointed a receiver to manage the company, Brody filed this bankruptcy case which stayed the state court litigation. Simmons seeks relief from the automatic stay so that it may proceed with the state court case.

The Court finds cause to partially grant the motion, including: 1) lack of adequate protection, 2) improper management of the property, and 3) the suitability of the state court proceeding to pursue the case to judgment. The Court lifts the automatic stay for the limited purpose of allowing Simmons to pursue in rem relief as to the Debtor on its collateral in state

court, but Simmons is not entitled to pursue a Sheriff's sale in said action or pursue relief through a receiver without further order of this Court so long as this case is pending.

I. Findings of Fact:[1]

For purposes of ruling on this contested matter, the Court finds:

*A. Brody Holdings Borrows from Simmons Bank*

The Debtor in this Chapter 11 bankruptcy case is Brody Holdings, LLC ("Brody"). Its 100% owner is Brandt Dumford ("Dumford"). Dumford holds an M.B.A. and a certificate from Wharton in real estate private equity. He has been employed in commercial real estate for many years and has experience calculating commercial real estate values. Through Brody, Dumford owns and manages a portfolio of real estate in and around Wichita, Kansas.

On June 5, 2025, Brody and Simmons Bank ("Simmons") entered into a Commercial Loan Agreement for a loan of $4,400,000 ("Loan 1"). In consideration of Loan 1, Brody executed a promissory note and granted Simmons a mortgage on three parcels of real property consisting of a commercial shopping center located at 200-202, 212 and 204-260 W. Greenway St., Derby, Kansas (the "Greenwood Property"). Brody also granted Simmons a security interest in all proceeds from the sale, assignment, rent, lease, exchange, transfer, or other disposition of the Greenwood Property.

On October 30, 2025, Brody and Simmons entered into a Business Loan Agreement for a second loan of $300,000 ("Loan 2", and together with Loan 1, the "Loans"). In consideration of Loan 2, Brody executed a promissory note and granted Simmons a mortgage

[1] The Court takes judicial notice of its docket in this case. *See Gee v. Pacheco*, 627 F.3d 1178, 1191 (10th Cir. 2010) ("We take judicial notice of court records in the underlying proceedings."); *United States v. Ahidley,* 486 F.3d 1184, 1192 n.5 (10th Cir. 2007) ("[W]e may exercise our discretion to take judicial notice of publicly-filed records in our court and certain other courts concerning matters that bear directly upon the disposition of the case at hand."). These facts are primarily derived from the record and evidentiary hearing held October 27, 2026, on Simmons' Motion for Relief from Stay [Doc. 100].

on the Greenwood Property and again, granted Simmons a security interest in all proceeds. Dumford personally guaranteed the Loans. Simmons perfected its liens.

### *B. Simmons Investigates and Sues*

At some point after Loan 2 was funded, Simmons learned that there were three additional mortgages encumbering the Greenwood Property filed by an entity, the Eck-90 Trust (the "Eck Trust"). At least one of the Eck Trust mortgages appeared to be filed prior to the Simmons mortgages and appeared to secure loans of $532,000. The Eck Trust mortgages were security for personal loans that John Eck, as settlor and trustee of the Eck Trust, made to Brody when it bought the Greenway Property and another property.

Just six months after Loan 2 was funded, Simmons sued Brody in the District Court of Kansas, Sedgwick County.[2] Simmons alleged various events of default under the Loans including failure to pay, failure to deposit rents, allowing liens to encumber the property, failing to ensure Simmons' mortgages were senior, over-drafting its accounts, and allowing judgments to attach to the Greenwood Property. On May 28, 2026, the state court issued an ex parte order appointing a receiver, Anderson Management Co., to manage, maintain, and operate the Greenwood Property.[3] Brody filed its Chapter 11 petition the next day, on May 29, 2026 (the "Petition Date"). Simmons asserts Brody owed a total of $4,756,688.94 on the Petition Date.

### *C. Brody Fails to Provide Adequate Information*

Simmons has had difficulty obtaining financial information from Brody since it filed this bankruptcy case in May of 2026. First, Simmons did not receive accurate information

---

[2] The suit is styled, *Simmons Bank v. Brody Holdings, LLC, et al.,* Case No. SG-2026-CV-001524 (the "State Court Case"), filed April 27, 2026 and is pending in the District Court of Sedgwick County, Kansas.
[3] *See* State Court Case, Doc. No. 42.

about payment of property taxes on the Greenwood Property. Before the bankruptcy, in March 2026, Dumford sent a screenshot to Simmons which purported to show two payments of property taxes, one for $25,062.62 and another for $55,834.60. Simmons believed these payments were for the 2025 taxes on Greenwood Property. Later, in doing its own research, Simmons discovered that Brody's bank had not honored the payments because of insufficient funds; Brody did not inform Simmons that the payments had not been honored. The 2025 taxes are still due and owing and are accruing interest. They are ad valorem taxes, with a lien position superior to Simmons. Brody currently owes over $100,000 for the 2025 property taxes on the Greenwood Property.

Likewise, Simmons has had difficulty obtaining information about insurance on the Greenwood Property. John Eck, in addition to being the trustee of the Eck Trust, is also the owner and president of the Eck Agency, the insurance agency from which Brody secured many of its insurance policies. Through the Eck Agency, premium financing companies financed many of Brody's premiums. Brody would pay approximately 10% of the annual property insurance premium down and pay the rest in monthly installments to the finance company. On the Greenway Property, Brody was late in paying its monthly premium payment and the finance company warned Brody that the insurance company would cancel the policy if it did not pay. Brody paid the premium installment and the Greenwood Property remained insured, but not before Simmons was notified in June of 2026 that a payment was late and that failure to pay would result in imminent cancellation of the policy. Because of the notice, Simmons obtained forced-placed insurance on the Greenwood Property at its own cost and continued to request information from Brody about the insurance policy. Although the Greenwood Property has been continuously insured, Simmons has still not received the information it requested, including the policy documents and proof that Simmons is listed as a loss payee on the policy.

Finally, Simmons has had difficulty obtaining copies of accurate and current leases between Brody and the tenants of the Greenwood Property. Dumford believes that he has given "everything he has" regarding any current leases to Simmons bank. From the leases provided, Simmons could not determine which, if any, leases are currently valid and performing.

In addition to the lease defects, at least one tenant in the Greenwood Property, Diane Williams, does not have a written lease for her business, The Body Shop Spa d/b/a Caribbean Sun. Williams bought the business in April 2026. She occupied the space of the former owner's business, which was also doing business as Caribbean Sun, and informally assumed the former business-owner's lease. She simply started paying the rent the former business owner had paid. After the bankruptcy was filed, Dumford sent her a text message that she should sign a written lease. She has not signed a lease to date.

*D. Brody agrees to provide Adequate Protection.*

On the Petition Date, Brody filed an emergency motion for an order authorizing the use of cash collateral.[4] The motion drew ten objections. At the initial hearing on the motion, Dumford represented to the Court that Brody had enough money to pay its immediate needs and it hoped to negotiate use of cash collateral with each creditor. Simmons objected to the use of its cash collateral, alleging that Brody did not provide appropriate adequate protection of its interests. An agreed order authorizing the interim use of cash collateral was entered on July 22, 2026 (the "Cash Collateral Order").[5] In the Cash Collateral Order, a list of current monthly rents (the "Rent Roll") showed that Brody was then collecting monthly rent from

[4] Doc. 8.
[5] *See Nunc Pro Tunc Agreed Order Authorizing Interim Use of Cash Collateral and Scheduling Final Hearing*, Doc. 121 (the "Cash Collateral Order").

the Greenway Property totaling $58,070.64. Although Brody did not provide Simmons with adequate information to confirm the rents listed, Brody represented that the Rent Roll was:

| Leased Space | Tenant | Monthly Rent |
|---|---|---|
| Tract 10, 200 W Greenway | Dollar Store/Indoor Garage Sales | $14,000.00 |
| Tract 10, 200A W Greenway | Dillons[6] | $5,134.64 |
| Tract 10, 204 W Greenway | Casa Martinez Restaurant | $3,815.00 |
| Tract 10, 206 W Greenway | Theresa Hill | $3,950.00 |
| Tract 10, 212 W Greenway | Earthwise | $5,500.00 |
| Tract 10, 218 W Greenway | Mindful | $3,290.00 |
| Tract 10, 224 W Greenway | Shawn Pomeroy Chiropractic | $3,000.00 |
| Tract 10, 250 W Greenway | EBT | $1,753.00 |
| Tract 10, 226-230 W Greenway | Select Medical | $6,100.00 |
| Tract 10, 232, 234, 238 W Greenway | Angel Alverez Barber Shop | $1,280.00 |
| Tract 10, 200 W Greenway | EBT | $3,878.00 |
| Tract 10, 200 W Greenway | Caribbean Sun Tanning | $1,870.00 |
| **TOTAL** | | **$58,070.64** |

In the Cash Collateral Order, Simmons and Brody agreed that the rents in the Rent Roll constituted Simmons' cash collateral and could only be used through October 31, 2026, first to pay Simmons its ongoing mortgage payments under the Loans, then to pay 1/12th of the ongoing annual ad valorem property taxes and insurance premiums. The tax and

[6] A footnote to the Rent Roll notes "Kroger-Dillons has signed an LOI under which rent will increase to $14,000.00 per month in October 2026."

insurance payments were to be paid directly to Simmons along with the regular monthly loan payments. This totals approximately $52,600 per month.[7] The Cash Collateral Order also granted Simmons replacement liens and required Brody to pay monthly adequate protection payments to Eck Trust of $4,020. Brody was also required to file monthly operating reports identifying the gross post-petition rents received and the disbursements made from the rents.[8]

*E. Brody Defaults.*

Under the Cash Collateral Order, Brody was to make monthly payments to Simmons beginning in July 2026. In August 2026, Brody paid Simmons one payment of roughly $30,000. That is the only payment Brody has made to Simmons since the Petition Date.

While Brody has filed monthly operating reports, the reports do not identify the gross post-petition rents received and the disbursements made from rents, as required by the Cash Collateral Order. Brody failed to pay Simmons because it used their cash collateral on an emergency basis to repair a broken fire sprinkler pipe at the Greenwood Property. The pipe flooded an area of the Dillon's store (one of the tenants) and put the property on a "fire watch" from the City of Derby necessitating immediate repair. Brody paid a repairman $32,000 in September 2026 to repair the pipe and owed another $32,000 in October. It also did not pay Simmons under the Cash Collateral Order because it used rents collected to pay other creditors. Brody has not filed a motion to authorize the use of cash collateral for either the emergency repairs or to pay other creditors.

---

[7] Simmons' regular monthly payment on Loan 1 is roughly $34,000 and on Loan 2 is roughly $4,500. Simmons' calculates that 1/12th the ongoing property tax is $9,100 and 1/12th the insurance premium is $5,000. So, under the Cash Collateral Order, Brody should be paying Simmons roughly $52,600 per month or about $210,400 through the end of October 2026.

[8] Cash Collateral Order, page 18, ¶ 6(g)(ii).

*F. Court approves Stretto*

To date, nine creditors, including Simmons, have filed notices of Brody's defaults under the Cash Collateral Order and four motions for relief from stay are pending. On September 8, 2026, Brody filed an application to employ Stretto, Inc. ("Stretto") as its exclusive real estate sale-process, refinancing, and capital-sourcing advisor.[9] At a hearing on the application on October 15, 2026, the Court found that Brody needs substantial assistance if it is to realize a successful reorganization. Therefore, the Court approved the application, giving Stretto 120 days from the entry of the order to either refinance or sell Brody's real estate holdings, including the Greenwood Property.[10]

II. Arguments and Procedural Posture

On June 30, 2026, Simmons filed its *Motion for Relief from Stay* (the "Motion"), alleging pre-petition events of default and lack of adequate protection, including, *inter alia*, potential lapse of insurance, ad valorem property tax accrual, failure to make loan payments, and bad faith.[11] Brody argues that there is a sufficient amount of equity in the Greenwood Property such that Simmons is sufficiently protected while Stretto attempts to refinance or sell the Greenwood Property.[12] An evidentiary hearing was held on October 27, 2026. After hearing testimony and admitting exhibits, the Court took the Motion under advisement.[13]

---

[9] Doc. 140 (the "Application").
[10] Doc. 217.
[11] Doc. 100.
[12] Doc. 129.
[13] Debtor appeared through counsel Tom R. Barnes, II and its representative, Brandt Dumford. Simmons appeared through counsel Klint Spiller. Eck-90 Trust appeared through counsel Edward Robinson. Kinetic Commercial Funding appeared through counsel Michael Fowler.

This Court has jurisdiction over this case under 28 U.S.C. §§ 157 and 1334.[14] This is a core proceeding under 28 U.S.C. § 157(b)(2)(G). Venue is proper under 28 U.S.C. § 1408. The Motion is a contested matter governed by Fed. R. Bankr. P. 9014.

III. Analysis and Conclusions of Law

Under § 362(a), the automatic stay prohibits, among other things, the continuation of a judicial proceeding that was commenced before the Petition Date.[15] A party in interest may request relief from the automatic stay to proceed with a pre-petition judicial proceeding under § 362(d). Here, Simmons seeks relief from the stay to proceed in state court on two grounds: 1) under § 362(d)(1) for cause and 2) under § 362(d)(2) because Brody lacks equity in the Greenwood Property and that property is not necessary for reorganization.

*A. "Cause" for Relief from Stay under § 362(d)(1)*

First, under § 362(d)(1), the Court shall grant relief from the stay "for cause, including the lack of adequate protection of an interest in property of such party in interest."[16] The term "cause" is not defined in the Bankruptcy Code but courts have found that "among the

---

[14] The District Court for the District of Kansas has referred all cases and proceedings arising under Title 11 or arising in or related to cases under Title 11 to the Bankruptcy Courts for the District of Kansas under the *Amended Standing Order of Reference of the United States District Court for the District of Kansas,* effective June 24, 2013. *See* D. Kan. Rule 83.8.5(a).

[15] Section 362(a)(1) reads:

> (a) Except as provided in subsection (b) of this section, a petition field under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of—
>
> (1) The commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

[16] § 362(d)(1), which reads:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1) for cause, including lack of adequate protection of an interest in property of such party in interest;

factors to be considered in determining whether the automatic stay should be modified for cause are the good or bad faith of the debtor and the injury to the movant if the stay is not modified."[17] Simmons has cause for relief from stay under § 362(d)(1) because it lacks adequate protection and the Debtor's conduct warrants such relief.

Lack of Adequate Protection. Although not the exclusive "cause" for relief from stay, lack of adequate protection is specifically defined as such in § 362(d)(1).[18] Here, under the Cash Collateral Order, Brody was required to pay Simmons approximately $210,400 by the end of October 2026. It has only paid $30,000. Due to Brody's default, Simmons lacks the adequate protection to which it is entitled.

Improper Management. "Cause" under § 362(d)(1) is not limited to the lack of adequate protection. "Because 'cause' is not further defined in the Bankruptcy Code, relief from stay for cause is a discretionary determination made on a case by case basis,"[19] and includes "how the parties have conducted themselves, their good or bad faith, and their motives."[20]

The record demonstrates that Brody has not properly managed the Greenwood Property, despite Dumford's qualifications. First, Brody sent Simmons' what it believed to be proof of property tax payment on the Greenwood Property. Then, when the payment was dishonored for insufficient funds, Brody failed to inform Simmons that ad valorem taxes were due and owing.

---

[17] *JE Livestock, Inc. v. Wells Fargo Bank, N.A. (In re JE Livestock, Inc.),* 375 B.R. 892, 897 (10th Cir. BAP 2007).
[18] *Id.*
[19] *In re Busch,* 294 B.R. 137, 140 (10th Cir. BAP 2003) (citing *Pursifull v. Eakin*, 814 F.2d 1501, 1506 (10th Cir. 1987)).
[20] *JE Livestock*, 375 B.R. at 897 ("The totality of the circumstances of a case encompasses, among other things, how the parties have conducted themselves, their good or bad faith, and their motives."), citing *In re Mack*, 347 B.R. 911, 915 (Bankr. M.D. Fla. 2006), citing *Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.),* 779 F.2d 1068, 1071 (5th Cir.1986).

Second, Brody failed to provide adequate proof of insurance, including policy documents and proof of Simmons' status as loss payee. Simmons received notice that Brody was late in its payment and had no choice but to obtain forced-placed insurance on the Greenwood Property.

Third, Brody represented in the Cash Collateral Order that the Greenwood Property was generating over $58,000 per month in rents. But Brody failed to provide Simmons with appropriate proof of actual, valid leases evidencing this rent. In many cases, the tenants listed in the leases do not correspond to those represented in the Rent Roll. Many of the leases do not even reference Brody as the landlord. Every lease Brody provided to Simmons was deficient in some way. The defects include:

1. Dillon's: The lease provided for the anchor tenant, Dillon's grocery store, was originally signed on August 9, 1976, by a previous owner but was not accompanied by an amendment, exercise of option, or any other documents showing that Dillion's is legally obligated to pay rent to Brody or at what amount. When asked for such documents, Dumford's response was that Dillon's is a major corporation and they would never operate on a month-to-month basis with a landlord and, therefore, there must be a valid lease. In an apparent attempt to mitigate the lack of extension documents, Dumford provided Simmons with two unsigned letters from Dillon's purporting to acknowledge an extension of the lease and another unsigned letter wherein Dillon's agreed to allow a Dollar Tree store to operate on the Greenwood Property. Dumford testified that the lease with Dillon's expires at the end of December 2026, and that Brody has not yet entered into an extension.[21]

[21] Exhibits L-1 through L-4.

2. Derby Dollar: This lease is between an entity, Rockport PB Investments, LP, ("Rockport") as landlord and tenant Charles Rupert, DBA Derby Dollar, LLC. There is no evidence in the record about the Rockport entity except that Dumford signed as its "agent" when it entered into the Adventurz lease (see below). The Derby Dollar lease contained blank commencement and length of term provisions. No assignment of this lease to Brody from Rockport was submitted.[22]

3. Casa Martinez: This is a lease amendment agreement purporting to extend a lease agreement entered into in 2019 between Brody and tenant Casa Martinez. The lease itself was not submitted.[23]

4. Adventurz Creative Playground: This lease is again between Rockport and tenant Theresa Hill/Dye Family LLC d/b/a Adventurz Creative Indoor Playground. By its terms, this lease ended September 30, 2026. No renewal was provided. No assignment of the lease to Brody from Rockport was provided.[24]

5. Earthwise Pet: This lease is between Rockport and tenant Earthwise Pet – Sam Johnson. Brody signed this lease as guarantor. It is also signed by Sam Johnson for Brody Holdings as guarantor which appears to be an error as Johnson is the tenant representative. No assignment of this lease to Brody from Rockport was provided.[25]

6. Mindful Collective: This lease between Brody and tenant Mindful Collective, LLC was provided to Simmons in Microsoft Word format. It contains

---

[22] Exhibit M.
[23] Exhibit N.
[24] Exhibit O.
[25] Exhibit P.

redline changes made by an unknown entity and is undated. It is unsigned by any entity.[26]

7. Pomeroy Chiropractic: This lease is between Rockport and tenant Pomeroy Chiropractic Wellness, P.A. It is signed neither by Rockport nor Brody.[27] A second copy of this lease was provided to Simmons unsigned by any party. No assignment of this lease to Brody from Rockport was provided.[28]

8. Madi Jenkins: This lease is between Brody and tenant Madi Jenkins. Although it appears to be electronically executed, the signatures are incorrectly placed throughout the document.[29] This tenant does not appear on the Rent Roll. Tenant Diane Williams, possibly the successor tenant, has never signed a lease.

9. Angel Alvarez: This lease is between Rockport and tenant Angel Alvarez. No assignment of the lease to Brody from Rockport was provided.[30]

10. Expressive Behavior Therapy: This lease is between Brody and Expressive Behavior Therapy, LLC. It is signed in ink by the tenant but unsigned by Brody. A second copy of this lease was provided that purports to be signed electronically by both parties. It is unclear which lease controls or if they are the same.[31]

Fourth, Brody's monthly operating reports are deficient. In its monthly operating reports Brody has failed to account for and itemize what rents it has received from which tenants in its reports; as a result, it is impossible for Simmons to determine with specificity the status of its cash collateral.

---

[26] Exhibit Q.
[27] Exhibit R.
[28] Exhibit R-1 and R-2.
[29] Exhibit S.
[30] Exhibit V-1 and V-2.
[31] Exhibit W.

Fifth, Brody has not adequately maintained the Greenwood Property. For example, one of the tenants testified there is a large pool of water in the parking lot that forms when it rains and there are weeds and potholes throughout the parking lot.

Finally, Dumford testified that he has worked in and around commercial real estate for many years and had specialized education in commercial property management. His actions are at odds with his education and expertise. Dumford's failure to adhere to standard commercial leasing standards (e.g., maintaining accurate rent rolls and leases, including assignments of those leases) confirms Brody's inability to sufficiently manage the Greenwood Property. Further, the Debtor, through Dumford's actions, is not complying with bankruptcy rules and restrictions. Although the Court is sympathetic to the urgency of flooding from a broken pipe, Dumford is sophisticated enough to understand the Court's scrutiny on Brody's use of cash collateral and to have sought emergency modification to the Cash Collateral Order to repair the leak. Although he testified that a second payment of $32,000 is due to the repairman, Brody has still failed to seek required approval. The Court concludes that Simmons has "cause" for stay relief based on the Debtor's conduct.

<u>Continuation of the State Court Litigation</u>. Under § 362(d)(1), a party in interest may have "cause" for relief from the stay if it is appropriate to permit litigation against the debtor to proceed in another forum. The Tenth Circuit "has recognized certain relevant factors which may be considered in making a determination of whether or not to modify the stay to permit litigation against the debtor to proceed in another forum,"—the so-called *Curtis* factors.[32]

[32] *In re Curtis*, 40 B.R. 795, 799-800 (Bankr. D. Utah 1984). The *Curtis* factors are:

(1) whether the relief will result in a partial or complete resolution of the issues;
(2) the lack of any connection with or interference with the bankruptcy case;
(3) whether the foreign proceeding involves the debtor as a fiduciary;
(4) whether a specialized tribunal has been established to hear the particular cause of action and that tribunal has the expertise to hear such cases;
(5) whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation;

Analysis of the *Curtis* factors is appropriate because Simmons requests leave to proceed with the State Court Case.

On balance, the *Curtis* factors weigh against lifting the stay to allow Simmons to pursue the State Court Case to finality. Although that litigation would result in a resolution of the issues—the foreclosure of the Greenwood Property (Factor 1)—the transfer of the Greenwood Property resulting therefrom would interfere with the rest of the bankruptcy case (Factor 2). If the Debtor had equity in the Greenwood Property on the Petition Date—a fact that remains unproven (see below)—such equity would be of utmost importance to the reorganization of the Debtor and the potential confirmation of a Chapter 11 plan. The State Court Case involves the Debtor as a main party (Factor 6) and other creditors would be prejudiced by the use of the Debtor's equity for any other purpose than those specifically authorized by the Bankruptcy Code (Factor 7). Finally, the interests of judicial economy, in both this Court and the state court, would be best served by the comprehensive relief the Bankruptcy Code can provide in Bankruptcy Court (Factor 10).

Simmons has met its burden to demonstrate cause exists to grant relief from the stay but the *Curtis* factors weigh against the execution of any state court judgment under these facts. Although it is appropriate for Simmons to prosecute its case to judgment or other disposition in state court, the ultimate execution and potential sale of the Greenwood

---

(6) whether the action essentially involves third parties, and the debtor functions only as a bailee or conduit for the goods or proceeds in question;
(7) whether litigation in another forum would prejudice the interests of other creditors, the creditors' committee and other interested parties;
(8) whether the judgment claim arising from the foreign action is subject to equitable subordination under Section 510(c);
(9) whether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor under Section 522(f);
(10) the interest of judicial economy and the expeditious and economical determination of litigation for the parties;
(11) whether the foreign proceedings have progressed to the point where the parties are prepared for trial; and
(12) the impact of the stay on the parties and the "balance of hurt."

Property would conflict with the Court's approval of Stretto to also seek the maximum value of the Greenwood Property. Thus, the Court is granting Simmons limited relief from the stay to obtain a judgment in the State Court Case.

*B. Relief from Stay under § 362(d)(2)*

Section 362(g) imposes the burden of proof on the party requesting relief from stay as to the issue of the debtor's equity in the property and on the party opposing relief as to all other issues.[33] Here, the burden is on Simmons to show that Brody has no equity in the Greenwood Property but the burden is on Brody to otherwise show that no "cause" exists under § 362(d)(1) and that the property is necessary for an effective reorganization under § 362(d)(2)(B).

<u>Equity in the Greenwood Property</u>. Simmons did not introduce evidence of the value of the Greenwood Property other than its representative's testimony that the value was approximately $7 million in April of 2025. But on cross examination, Simmons' representative also testified to other valuations ranging from $4.9 million to $7.2 million based on various methods of computation. While Simmons showed that as of the Petition Date it was owed $4,756,688.94, the Court cannot conclude, because of the lack of valuation evidence presented, that Brody has no equity in the Greenwood Property. Moreover, Simmons alleges that the Eck Trust and the ad valorem property taxes prime Simmons' liens, but no evidence was presented as to the amounts and validity of such liens. Simmons has not

---

[33] See § 362(g) which reads:

> (g) In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section—
> (1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and
> (2) the party opposing such relief has the burden of proof on all other issues.

carried its burden to show that Brody has no equity in the Greenwood Property sufficient for relief from stay under § 362(d)(2)(a).

Necessary for an Effective Reorganization. Section 362(d)(2) requires proof of both no equity under § 362(d)(2)(a) and that the property is not necessary for an effective reorganization under § 362(d)(2)(b). Because the Court finds that Simmons has not established Brody's lack of equity, it need not address whether Brody has shown that the Greenwood Property is necessary for an effective reorganization and declines to do so.

**Conclusion and Order**

Although Simmons did not demonstrate that Brody has no equity in the Greenway Property, it demonstrated that cause exists to grant relief from the automatic stay due to Simmons' lack of adequate protection and Brody's improper management. But the *Curtis* factors weigh against relief and the Court has given Stretto 120 days from the entry of its order to try to refinance or sell the Greenwood Property. Therefore, stay relief is limited to Simmons' pursuit of in rem relief as to the Greenwood Property in state court and does not include a Sheriff's sale or relief through a receiver without further order of this Court.

WHEREFORE, THE COURT ORDERS that for the above reasons, the Court partially grants and partially denies the Motion. The automatic stay is lifted as set forth above. Nothing in this order prohibits Stretto from proceeding in this bankruptcy case according to the terms of its approved employment herein.

IT IS SO ORDERED.

###